## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

**CHRISTOPHER GAUDET**                                   **CIVIL ACTION**

**VERSUS**                                                      **NO. 22-271**

**TIM HOOPER, WARDEN**                          **SECTION: "M"(1)**


## REPORT AND RECOMMENDATION

Petitioner, Christopher Gaudet, a Louisiana state prisoner, filed this federal application seeking habeas corpus relief pursuant to 28 U.S.C. § 2254. For the following reasons, it is recommended that the application be **DISMISSED WITH PREJUDICE**.

Petitioner pleaded guilty to three counts of cruelty to a juvenile on November 5, 2015,[1] and he was convicted by a unanimous jury on three counts of aggravated rape on November 6, 2015.[2] On January 22, 2016, he was sentenced on each count of cruelty to a juvenile to five years imprisonment and on each count of aggravated rape to life imprisonment without benefit of probation, parole, or suspension of sentence. It was ordered that those sentences be served concurrently.[3] The Louisiana First Circuit Court of Appeal affirmed his convictions and sentences on October 31, 2016,[4] and the Louisiana Supreme Court denied his related writ application on September 15, 2017.[5]

---

[1] State Rec., Vol. 5 of 8, trial transcript, pp. 572-87; State Rec., Vol. 1 of 8, minute entry dated November 5, 2015.

[2] State Rec., Vol. 5 of 8, trial transcript, pp. 666-67; State Rec., Vol. 1 of 8, minute entry dated November 6, 2015; State Rec., Vol. 2 of 8, jury verdict forms.

[3] State Rec., Vol. 1 of 8, minute entry dated January 22, 2016.

[4] State v. Gaudet, No. 2016 KA 0631, 2016 WL 6427773 (La. App. 1st Cir. Oct. 31, 2016); State Rec., Vol. 6 of 7.

[5] State v. Gaddet [sic] 225 So. 3d 477 (La. 2017); State Rec., Vol. 6 of 8. The undersigned notes that petitioner's name is correctly reflected in the Louisiana Supreme Court's original opinion, but his surname incorrectly appears as "Gaddet" in the published opinion.

On June 8, 2018, the state district court received from petitioner an unsigned state post-conviction application, which he later signed and returned at the court's direction.[6]    That application was denied on September 16, 2020.[7]  His related writ applications were likewise denied by the Louisiana First Circuit Court of Appeal on January 14, 2021,[8] and the Louisiana Supreme Court on May 11, 2021.[9]

On or about December 10, 2021, petitioner filed the instant federal application seeking habeas corpus relief.[10]  The state filed a response arguing that petitioner's claims have no merit,[11] and he filed a reply.[12]

## I.  Standards of Review

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") "modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law."  Bell v. Cone, 535 U.S. 685, 693 (2002); accord Langley v. Prince, 926 F.3d 145, 155

---

[6] State Rec., Vol. 6 of 8.

[7] State Rec., Vol. 7 of 8, Reasons for Judgment and Judgment dated September 16, 2020.

[8] State v. Gaudet, No. 2020 KW 1020, 2021 WL 141229 (La. App. 1st Cir. Jan. 14, 2021); State Rec., Vol. 7 of 8.

[9] State v. Gaudet, 315 So. 3d 856 (La. 2021); State Rec., Vol. 7 of 8.

[10] Rec. Doc. 1.

[11] Rec. Doc. 8.  In that response, the state opines that "the petition appears to be timely."  Id. at p. 6.  That observation appears to be based on a belief that statutory tolling of the federal limitations period did not cease until ninety days after the Louisiana Supreme Court denied petitioner's post-conviction writ application.  If so, that is incorrect – a petitioner receives no tolling credit for the period during which he could have sought further review by the United States Supreme Court with respect to the denial of state post-conviction relief.  Lawrence v. Florida, 549 U.S. 327, 332 (2007); Ott v. Johnson, 192 F.3d 510, 512-13 (5th Cir. 1999).  If petitioner's limitations period is correctly calculated, it appears that it expired before the instant application was filed.  Nevertheless, the state does not raise that defense, and the Court is not required to raise it on the state's behalf.  See Day v. McDonough, 547 U.S. 198, 209-10 (2006) ("[D]istrict courts are permitted, but not obliged, to consider, sua sponte, the timeliness of a state prisoner's habeas petition. ... If, as this Court has held, district judges have no obligation to act as counsel or paralegal to pro se litigants, then, by the same token, they surely have no obligation to assist attorneys representing the State." (citation, footnote, quotation marks, and brackets omitted)).

[12] Rec. Doc. 9.

(5th Cir. 2019) (noting that the AEDPA imposes a "relitigation bar" on claims adjudicated on the merits by the state court).  The applicable standards of review are now as follows.

As to pure questions of fact, factual findings are presumed to be correct and a federal court must give deference to the state court's decision unless it "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(2); see also 28 U.S.C. § 2254(e)(1) ("In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct.  The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.").

As to pure questions of law and mixed questions of law and fact, a federal court must defer to the state court's decision on the merits of such a claim unless that decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).  Courts have held that the "'contrary to' and 'unreasonable application' clauses [of § 2254(d)(1)] have independent meaning."  Bell, 535 U.S. at 694.

Regarding the "contrary to" clause, the United States Fifth Circuit Court of Appeals has explained:

> A state court decision is contrary to clearly established precedent if the state court applies a rule that contradicts the governing law set forth in the [United States] Supreme Court's cases.  A state-court decision will also be contrary to clearly established precedent if the state court confronts a set of facts that are materially indistinguishable from a decision of the [United States] Supreme Court and nevertheless arrives at a result different from [United States] Supreme Court precedent.

<u>Wooten v. Thaler</u>, 598 F.3d 215, 218 (5th Cir. 2010) (footnotes, internal quotation marks, ellipses, and brackets omitted).

Regarding the "unreasonable application" clause, the United States Supreme Court has held: "[A] state-court decision is an unreasonable application of our clearly established precedent if it correctly identifies the governing legal rule but applies that rule unreasonably to the facts of a particular prisoner's case." <u>White v. Woodall</u>, 572 U.S. 415, 426 (2014). However, a federal habeas court must be mindful that "an unreasonable application is different from an incorrect one." <u>Bell</u>, 535 U.S. at 694; <u>accord</u> <u>Harrington v. Richter</u>, 562 U.S. 86, 102-03 (2011) ("Section 2254(d) reflects the view that habeas corpus is a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal." (quotation marks omitted)); <u>Langley</u>, 926 F.3d at 156 ("The Supreme Court has repeatedly held that it is not enough to show the state court was wrong."); <u>Puckett v. Epps</u>, 641 F.3d 657, 663 (5th Cir. 2011) ("Importantly, 'unreasonable' is not the same as 'erroneous' or 'incorrect'; an incorrect application of the law by a state court will nonetheless be affirmed if it is not simultaneously unreasonable."). Therefore:

> "[T]he [AEDPA's] relitigation bar forecloses relief unless the prisoner can show the state court was *so* wrong that the error was well understood and comprehended in existing law beyond any possibility for fairminded disagreement. In other words, the unreasonable-application exception asks whether it is beyond the realm of possibility that a fairminded jurist could agree with the state court.

<u>Langley</u>, 926 F.3d at 156 (citations and quotation marks omitted). "Under AEDPA's relitigation bar, the very existence of reasonable disagreement forecloses relief." <u>Id.</u> at 170.

Further, the Supreme Court has expressly cautioned:

> Section 2254(d)(1) provides a remedy for instances in which a state court unreasonably applies this Court's precedent; it does not require state courts to

4

> extend that precedent or license federal courts to treat the failure to do so as error. Thus, if a habeas court must extend a rationale before it can apply to the facts at hand, then by definition the rationale was not clearly established at the time of the state-court decision. AEDPA's carefully constructed framework would be undermined if habeas courts introduced rules not clearly established under the guise of extensions to existing law.

Woodall, 572 U.S. at 426 (citations and quotation marks omitted). Therefore, when the Supreme Court's "cases give no clear answer to the question presented, let alone one in [the petitioner's] favor, it cannot be said that the state court unreasonably applied clearly established Federal law." Wright v. Van Patten, 552 U.S. 120, 126 (2008) (quotation marks and brackets omitted).

In summary, "AEDPA prevents defendants – **and federal courts** – from using federal habeas corpus review as a vehicle to second-guess the reasonable decisions of state courts." Renico v. Lett, 559 U.S. 766, 779 (2010) (emphasis added). The Supreme Court has expressly warned that although "some federal judges find [28 U.S.C. § 2254(d)] too confining," it is nevertheless clear that "all federal judges must obey" the law and apply the strictly deferential standards of review mandated therein. Woodall, 572 U.S. at 417.

## II.  Facts

On direct appeal, the Louisiana First Circuit Court of Appeal summarized the facts of this case as follows:

> On July 15, 2014, the Lafourche Parish Sheriff's Office (LPSO) received a complaint of physical and sexual abuse of the seven-year-old male victim in this case, T.T., and subsequently uncovered similar allegations of abuse of his nine-year-old brother G.T., and his three-year-old brother L.T., the other victims herein.[FN 2]  The defendant began dating B.T. in 2013, and she and her four children (the victims and their sister A.T.) moved into the defendant's home during the summer.  On alternating weekends, the children routinely stayed with their grandmother, where T.T.'s biological father T.L. was living at the time.  In mid-July of 2014, T.T. revealed to T.L. that the defendant was forcing his "dick" into T.T.'s mouth.  Upon T.T's disclosure, T.L. questioned the oldest child G.T., who used similar language to indicate that the defendant forced him to have oral sex

with him.  T.L. immediately informed the victims' grandmother of the disclosure, and they confronted B.T., who denied any abuse by the defendant.  After later observing bruises on T.T.'s body, T.L. contacted the Sheriff's Office and reported allegations of abuse of his son.

In response to T.L.'s complaint, Deputy Aaron Schneck and Detective Dale Savoie arrived at the victims' grandmother's residence (in Raceland, Louisiana). Detective Savoie, who was assigned to the case, noted that T.T. had severe bruises on his right upper leg, and had other minor bruising, including a red mark on his back.  The officers took photographs of the bruises on T.T.'s leg, back, and neck. The following day, July 16, 2014, Detective Savoie contacted the Children's Advocacy Center (CAC) and the Department of Children and Family Services (DCFS), a forensic interview of the victim took place, and additional photographs of the victim were taken.  That evening, after T.T.'s CAC interview, Detective Savoie returned to the residence, L.T. was photographed, and CAC forensic interviews of the other three children were conducted.  During their CAC interviews, G.T. and L.T. alleged that the defendant forced all three of the boys to have oral sex with him.

> [FN 2]  G.T.'s date of birth is December 10, 2004, L.T.'s date of birth is July 21, 2010, and T.T.'s date of birth is December 20, 2006.  The child victims, their mother, and T.T.'s biological father are referenced by initials only.  See La. R.S. 46:1844(W).[13]

### III.  Petitioner's Claims

### A. Sufficiency of the Evidence

Petitioner's first claim is that there was insufficient evidence to support his aggravated rape convictions.  On direct appeal, the Louisiana First Circuit Court of Appeal denied that claim, holding:

> In assignment of error number one, the defendant argues that the evidence was insufficient to support the aggravated rape convictions.  The defendant contends that the State asked the jury to disregard the lack of any physical evidence and inconsistencies between the children's pretrial statements and testimony.  The defendant further claims that T.L. had a motive for reporting sexual abuse to the police, noting that T.L. wanted B.T. to leave the defendant but she refused to do so. The defendant notes that while T.L. had made previous reports of negligence and physical abuse, the children were not removed from the home until the allegations of sexual abuse were made.  The defendant also notes that T.L. was a convicted

---

[13] State v. Gaudet, No. 2016 KA 0631, 2016 WL 6427773, at *1 (La. App. 1st Cir. Oct. 31, 2016); State Rec., Vol. 6 of 7.

felon and that he waited four days before reporting sexual abuse allegations. The defendant argues that T.L. and the victims' grandmother would have immediately reported the allegations if they really believed that the victims had been sexually abused.

Further, the defendant notes that T.L.'s son, T.T., denied being sexually abused during the CAC interview and tried to leave twice during the interview. The defendant notes that L.T. left the interview room twice, only disclosed sexual abuse after twice being coaxed to return to the room, and used the word "tick" in claiming that the defendant put something in his mouth, while the CAC interviewer assumed that he used the word "dick." The defendant further notes that L.T. later testified that he was told to say that the defendant put his private in his mouth. The defendant contends that G.T.'s trial testimony was inconsistent with statements made during his CAC interview, specifically contending that G.T. was inconsistent as to where they showered and as to whether he saw the defendant rape A.T. while she had overnight guests sleeping next to her. The defendant also cites various other statements by G.T. as being inconsistent, noting for example that G.T. initially stated that the defendant went to jail for smoking cigarettes and hitting them, and subsequently stated that he did not know why the defendant was in jail. The defendant argues that A.T.'s pretrial statements were not credible, noting that she claimed that the house was haunted, that she used the word "rape" even though she did not know what the word meant, and that she further stated that her mother raped people. The defendant also notes that A.T. claimed that she saw what happened in the bathroom from outside even though the window had been boarded up for years. The defendant asserts that "all the lies that were told" and the "horrible conditions" that the children were living in possibly influenced the children to make the accusations of sexual abuse. The defendant also argues that two of the children were obviously coached, in concluding that the jury should have found reasonable doubt.

A conviction based on insufficient evidence cannot stand as it violates Due Process. See U.S. Const. amend. XIV; La. Const. art. I, § 2. The standard of review for the sufficiency of the evidence to uphold a conviction is whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). See also La. Code Crim. P. art. 821(B); State v. Ordodi, 2006-0207 (La. 11/29/06), 946 So.2d 654, 660; State v. Mussall, 523 So.2d 1305, 1308-09 (La. 1988). The Jackson standard of review, incorporated in Article 821(B), is an objective standard for testing the overall evidence, both direct and circumstantial, for reasonable doubt. When analyzing circumstantial evidence, La. R.S. 15:438 provides that the fact finder must be satisfied that the overall evidence excludes every reasonable hypothesis of innocence. See State v. Patorno, 2001-2585 (La. App. 1st Cir. 6/21/02), 822 So.2d 141, 144.

La. R.S. 14:42(A)(4) specifically defines the crime of aggravated rape as a rape committed where the anal, oral, or vaginal sexual intercourse is deemed to be

without lawful consent of the victim because it is committed when the victim is under the age of thirteen years. The testimony of the victim alone can be sufficient to establish the elements of a sexual offense, even where the State does not introduce medical, scientific, or physical evidence to prove the commission of the offense. State v. James, 2002-2079 (La. App. 1st Cir. 5/9/03), 849 So.2d 574, 581.

At the trial herein, T.L. testified that he was living with the victims' grandmother in July of 2014. During that time period, T.L. would routinely pick the children up from their home with the defendant and B.T. on alternating weekends, and they would stay at their grandmother's residence overnight. T.L. testified that as he, T.T., and L.T. were in the living room watching cartoons, he overheard L.T. suggesting that they tell him something. Specifically, he testified that L.T. stated, "[T.L.] will make him stop ... beat him up." At that point, T.L. told the boys to tell him what they were talking about and T.T. made the initial disclosure that the defendant was forcing his "dick" into T.T.'s mouth. T.L. testified that upon his son's disclosure, T.L. spoke to the oldest child, G.T., noting that G.T. trusted him. T.L. explained to G.T. that it was okay to tell him the truth and further reassured him he would protect them before asking him "if he ever knew or seen anything about the boys being touched or forced from Chris." At that point, G.T. put his head down and started crying and stated, "Yeah, [T.L.]," adding that he tried to stop the defendant but was unable to do so. T.L. further testified that G.T. specifically told him that the defendant forced him to have oral sex, noting that the victim used the words, "suck his dick." T.L. testified that he and the victims' grandmother discussed the issue, noting that they were previously aware of the fact that the defendant was "hitting on them (the victims) and stuff like that," and decided to confront and question B.T. with the accusations. T.L. surmised that the victims' disclosure occurred on a Saturday or during the weekend. They were able to contact B.T. either later on the day of the disclosure or the next day, and told her about the boys' disclosure. B.T. denied that it happened, and they told her that since the boys stated otherwise the matter needed to be investigated. T.L. further testified that the Monday following the disclosure, G.T. was scheduled to go to New Orleans for surgery due to a hernia, delaying their plans to separate the victims from the defendant and B.T. to allow them to report the claims.

The day after G.T.'s procedure, the children returned to their grandmother's house. T.L. further testified that T.T.'s grandmother immediately alerted him upon observing bruises on T.T.'s body while bathing T.T. T.L. observed T.T.'s injuries and questioned T.T., who indicated that the defendant kicked him, punched him, and hit him after B.T. told the defendant about the victims' disclosure of sexual abuse. At that point, T.L. called the Sheriff's Office and reported T.T.'s disclosure of sexual and physical abuse by the defendant. T.L. confirmed that he had previous convictions for possession of cocaine and misdemeanor offenses. T.L. further confirmed during cross-examination that up to a month before the victims' disclosure, T.L. contacted DCFS several times to report that the victims were being abused and neglected. T.L. stated that he contacted DCFS because B.T. would "take off with the kids at two or three in the morning walking down the highway

and stuff like that," further noting that T.T. twice informed him that the defendant punched him in his chest and knocked him against a wall. T.L. confirmed that he wanted the children to be removed from that situation and into a safe environment. He also confirmed going to the children's school and asking for assistance. When asked why he did not immediately call the police over the weekend when the children made the disclosure, T.L. stated that the accusations were serious and he wanted to be sure before pressing charges, noting that seeing T.T.'s physical injuries preceded the immediate police report. On re-direct examination, T.L. denied telling the victims to make the instant accusations.

Deputy Schneck and Detective Savoie confirmed that T.L.'s July 15, 2014 complaint only involved the physical and sexual abuse of T.T., his biological son. Detective Savoie testified that prior to the first CAC interview (T.T.'s interview), he provided the forensic interviewer Shannon Gros with names and ages, and relayed the nature of the complaint as suspected physical and sexual abuse, without further details. Detective Savoie noted that while sexual abuse was initially suspected only as to T.T., he suspected physical abuse as to all three victims, noting that T.L. and T.T. had informed him that all of the children received beatings and spankings.

At the beginning of the CAC interview, Gros questioned T.T., who was then seven years old, regarding his knowledge of the difference between the truth and a lie. T.T. described a lie as something "bad" and was further able to distinguish the truth from non-truths. T.T. stated that his "Mo-mo" brought him to the interview and noted that he lived with her and T.L., whom he referred to as "Mo-mo's husband." He further stated that he did not like T.L. because he was angry and grouchy. When asked if anyone ever did anything to him he initially responded negatively, but stated, "yes" when asked if anyone ever hurt him. T.T. specifically added that Chris, whom he also referred to as "Mommy's husband," punched him on his leg and back, and "slung" him. After being asked if Chris ever did anything else or made him do anything or did anything to anyone else, T.T. paused before ultimately stating that L.T. was punched by the defendant. When asked if anyone ever touched him where he should not be touched, or used any part of their body or his body, T.T. gave a delayed, negative response. Gros showed the victim anatomically correct drawings of a boy and a girl in order to have the victim identify body parts. The victim denied that anyone ever touched the body part that he called a "weenie" or made him touch theirs, and denied ever seeing anyone else's "weenie" before stating that he wanted to go back to the room with his grandmother. When asked about his bruises, he stated that the defendant bruised him, and that he did not know why the defendant did so. The interview was then concluded.

L.T., who was only three years old at the time of the CAC interviews, could not speak clearly and sometimes used the wrong consonant to begin a name or word. L.T. did not want to remain seated during the interview, and sometimes became distracted and unresponsive.[FN 3] When necessary, Gros repeated questions and allowed L.T., who did not hesitate in doing so, to correct him when he was misheard or misunderstood. When asked who his mother and father were,

L.T. attempted to, but could not, correctly pronounce the defendant's first name, and later referred to the defendant as "my Taddy" when asked for clarification. When asked if he liked living with the defendant, L.T. responded positively. He added, "I love him but him, him fighting on my mama." L.T. corrected Gros when he asked him if the defendant would bite his mother, indicating that the defendant would "fight" and "punch" his mother. He stated that he did not like it when the defendant would hit his mother and responded positively when asked if the defendant ever hit him, stating that the defendant would punch him on the leg and hit him in the face. He also stated that the defendant would hit and punch his siblings. When Gros asked L.T. if the defendant did anything else to any other part of his body, L.T. stated that the defendant would make him mad. L.T. seemed to further indicate that the defendant told him that he would take his eye out with a knife.[FN 4]

> [FN 3]  Though he was three years old based on the birthdate in the bill of information, L.T. stated that he was two years old at the beginning of the interview. By the time of the trial he knew his correct age and, consistent with the bill of information and his mother's testimony, testified that he was five years old.

> [FN 4]  L.T. began walking around the room at the beginning of the interview, and at one point walked out of the room, stating that he was "coming right pack." As it appeared in the video and as Gros testified, L.T. walked back into the room on his own accord and the interview resumed.

After being asked if anyone ever told him not to say something that was done to him, L.T. stated, that Chris "put his tick in our mouth." Though L.T. was unable to pronounce the words clearly, he pointed to his front private area in describing the part of the defendant's body that was placed in his and the other victims' mouths, specifically naming all three of his siblings, including his sister. He also referred to the "tick" as the defendant's "pole" and stated that it tasted "nasty." L.T. responded positively when asked if something came out of it, but did not respond when questioned as to what came out of it, repeatedly referring to it as a "pole." By turning away and telling him that he did not have to show him, Gros stopped L.T. when he attempted to pull his pants down to show the interviewer the specific body part to which he was trying to make reference. L.T. also stated that the defendant was "humping" his mother "in and out," before walking out of the room for the second time. At that point, Gros discontinued the interview.

Gros also interviewed the victims' sister, A.T., who was six years old. A.T. confirmed that she knew the difference between a lie and the truth and was instructed to tell the truth. A.T. stated that the defendant was in jail for abusing her, her mother, and her brothers. She stated that the defendant would fuss at her for nothing and would fight with her mother, specifically stating that he gave her mother a black eye and a bloody lip and stepped on her head on one occasion. When asked what the defendant was saying when he stepped on her mother's head, she used the words "raping other boys." As one of her brothers opened the door of the

interview room and interrupted the interview, A.T. stated that T.T. and L.T. were "the most baddest" ones and would hit people and lie sometimes, and stated that she would also lie sometimes. A.T. stated that the defendant would whip her sometimes with a belt on her butt and denied that he would whip her anywhere else. When asked if the defendant did anything else he was not supposed to do, she indicated that the defendant would whip her siblings, "for doing nothing." When questioned in that regard, A.T. identified "privates" as a place where someone should not touch her, and denied that anyone ever did anything to her privates or made her do anything with their privates or talked to her about "privates." She confirmed that the defendant told her not to say certain things, specifically stating that he told her not to tell the police about him fighting with her mother. A.T. specifically denied seeing the defendant's private. She also denied that he had made her do anything with his private.

Gros questioned A.T. about L.T.'s claim that someone put his private in their mouths. A.T. stated that it happened to her and her siblings a "long time ago" and that she did not know who did it to them, but added that her mother told the person to stop. She then stated that it only happened to L.T., and when questioned about L.T. possibly claiming that it was the defendant, A.T. stated, "it would be true," adding, "I just was scared to tell you." A.T. confirmed that the defendant did the same thing to her brothers, but specifically added that he "never" did so with her. When asked what happened to her brothers, she stated that the defendant told the boys to come with him into her (A.T.'s) bedroom and that they closed the door. She then went outside, and "climbed up" and looked at them through her window. When Gros asked what she saw the defendant doing, she stated, "making [T.T.] and [G.T.]," and she paused. When Gros stated that he did not understand what Chris was making her brothers do, A.T. continued to color and did not respond. When asked how T.T.'s body was moving when the defendant was making him do something, A.T. stated, "he was trying to take Chris private out of his mouth." She further stated that Chris was whipping T.T., as T.T. started crying and continued to try to push the defendant's private out of his mouth. She stated that she saw the defendant do the same thing to G.T., and that G.T. also tried to get the defendant's private out of his mouth. She stated that her mother was outside watering plants at the time.

A.T. stated that she and her brothers told her mother what happened, and that her mother asked the defendant, "Chris why you been doing that?" She further stated that the defendant acted like he did not know what her mother was talking about. She stated that her mother told the defendant to get out of the house, and further told the defendant that the house was haunted. As she changed the subject, A.T. elaborated on the house being haunted, noting that one of the doors would close by itself. Gros, in an attempt to get back on subject at issue, asked A.T. if the defendant ever put anything in her mouth and she responded negatively. She confirmed that he did so to L.T. along with her other brothers, but that she was not present when it happened to L.T., before again changing the subject to ghosts. Gros then concluded the interview.

During the final CAC interview, G.T. (who was nine years old) stated that he lived with his mother and Chris, "the man who went to jail" for "being bad." When asked what the defendant did, G.T. stated that he was smoking cigarettes and "hitting us" on the leg, back, and arms.  G.T. described an incident of the defendant punching his mother and stated that he did not like the defendant.  G.T. stated that the defendant, "touched my private," forced T.T. to "do it," and forced "me to do it."  He specified that this happened before he got his cut (referring to the procedure that he had) and that it happened when they were in the shower.  G.T. paused when asked what the defendant forced him and T.T. to do, and confirmed that he would rather write it down.  Though unclear, his writing appeared to include the words "suck" and "dike."  G.T. was asked to pronounce what he wrote and clarified it as being the claim that the defendant made them suck his "dick."  G.T. stated that the defendant forced him, T.T., and L.T. to put it in their mouths and that something clear came out of it.  He stated that it happened more than once, when they were in the shower naked.  When asked how the defendant forced them, G.T. stated that the defendant told them that he would ground them for life and never let them go outside, and that he grabbed his belt and started whipping them.

G.T. stated that he told T.L. what happened.  G.T. stated that T.L. was a drug dealer and added that T.L. was the only person that he trusted, noting that he grew up with him.  However, G.T. also stated that he did not like the fact that T.L. did the same thing as Chris.  When asked to elaborate, he stated that they laid in the bed all day, and would not feed him and his siblings, and would whip them.  G.T. denied that T.L. ever did anything that involved private parts.  When asked if the defendant did anything else with privates, G.T. stated that the defendant tried to make A.T. "do it," but she said, "no, stop it."  He stated that he did not see the attempt but could hear A.T. crying.  G.T. noted that T.L. said that he would "kick mama's ass" if she went back to "that man."  When asked how the defendant's private looked, G.T. used the words big, hairy, and ugly.  He confirmed that the incidents occurred before his hernia surgery.

After the CAC interviews were played, the victims were questioned in a separate room from the jury.[FN 5]  Each of the victims confirmed their ability to be truthful.  T.T. was asked about the bruises in the photographs and consistently testified that the defendant put the bruises on his body.  T.T. was not required to testify about the rape claim.

[FN 5]  By court order, in conformity with La. R.S. 14:283, and without objection, the children testified in a room other than the courtroom.

L.T. confirmed that the defendant put the bruises on his body as photographed.  He stated that the defendant was in jail because he "beat up mama." On cross-examination, L.T. pointed downward when asked what else the defendant did to him besides hitting him.  He responded negatively when asked if anyone ever told him to say what the defendant did to him, and again responded negatively when specifically asked, "Did [T.L.] ever tell you to say that?"  L.T. finally provided a

positive response when the defense revisited the inquiry, specifically asking, "Did anybody ever tell you to say that Mr. Chris put his private in your mouth?  Is that a yes?"  However, he did not respond when asked who did so.  On redirect examination, L.T. confirmed that he told the truth and responded positively when questioned as follows, "Mr. Tracy asked you if Mr. Chris made you put his [sic] mouth on his bird?  Did he ever make you do that?"

When asked to identify the defendant, G.T. testified that he was the man who touched them in the wrong places.  G.T. further testified that the writing that he created during the CAC interview was his attempt to write "Suck dick."  G.T. then testified as follows regarding the defendant's actions, "He made [L.T.] and [T.T.] suck his dick and he had tried to rape [A.T.].  When asked what he meant by the word rape, he stated that the defendant, "Got on top of her."  G.T. confirmed that he saw the defendant do these things, and that he was in the bathtub with his siblings and the defendant at the time.  He stated that "some clear stuff" came out, when asked what came out of it (the defendant's "dick").  On cross-examination, G.T. denied that T.L. told him to make the accusations at issue.

The victims' mother, B.T., testified at the trial and confirmed that she had been convicted of cruelty to a juvenile relating to the claims in this case.  B.T. testified that she and the defendant dated for a year and seven months and were living together in July of 2014, along with the defendant's sister Karen Harris and her husband Willie Harris, and the victims.  B.T. confirmed that the defendant sometimes took showers with the boys and explained that they did so because, "the money situation started getting tight."  She testified that she never saw the defendant touch the children or make them touch him inappropriately.  Harris also testified, confirming that she took photographs to show that the windows were boarded up when the defendant and the victims lived there, and that there was one bathroom in the house.

As the final witness, the defendant denied ever touching the children in a sexually inappropriate way.  The defendant confirmed that he pled guilty to three counts of cruelty to juveniles in this case.  The defendant testified that the children lied about the claims of sexual abuse and stated that he had no idea as to why they would concoct the claims.  He added that the children did not have a good life and were growing up in an environment that included him drinking and doing drugs specifically stating, "They looking at two parents high."  The defendant confirmed that the boys would take a shower together, but denied that he took showers with them.  When asked if the boys ever saw his private part, he stated that it was possible that they saw him when he would get out of the shower to get a towel.

The trier of fact is free to accept or reject, in whole or in part, the testimony of any witness.  Moreover, where there is conflicting testimony about factual matters, the resolution of which depends upon a determination of the credibility of the witnesses, the matter is one of the weight of the evidence, not its sufficiency.  State v. Richardson, 459 So.2d 31, 38 (La. App. 1st Cir. 1984).  The trier of fact's determination of the weight to be given evidence is not subject to appellate review.  An appellate court will not reweigh the evidence to overturn a fact finder's

determination of guilt. State v. Taylor, 97-2261 (La. App. 1st Cir. 9/25/98), 721 So.2d 929, 932. Further, a reviewing court errs by substituting its appreciation of the evidence and credibility of witnesses for that of the fact finder and thereby overturning a verdict on the basis of an exculpatory hypothesis of innocence presented to, and rationally rejected by, the jury. See State v. Calloway, 2007-2306 (La. 1/21/09), 1 So.3d 417, 418 (per curiam). When a case involves circumstantial evidence and the trier of fact reasonably rejects the hypothesis of innocence presented by the defendant's own testimony, that hypothesis falls, and the defendant is guilty unless there is another hypothesis that raises a reasonable doubt. State v. Captville, 448 So.2d 676, 680 (La. 1984). Herein, the trier of fact obviously found the victims credible. The youthful victims described acts of oral sexual intercourse being forced upon them by the defendant. The victims were largely consistent, and did not seem to be rehearsed or coached into making the accusations.

In reviewing the evidence, we cannot say that the jury's determination was irrational under the facts and circumstances presented to them. See Ordodi, 946 So.2d at 662. The evidence presented, including the testimony regarding the initial disclosure of oral sex to T.L. by T.T. and G.T., the evidence of physical abuse, the victims' CAC interviews and trial testimony, and the victims' sister's CAC interview, was sufficient to support the verdicts regarding the three victims. Viewing the evidence in the light most favorable to the prosecution, we find that a rational trier of fact could have found the essential elements of the three offenses of aggravated rape were proven beyond a reasonable doubt. We find no merit in the first assignment of error.[14]

The Louisiana Supreme Court then likewise denied relief without assigning additional reasons.[15]

Because a claim challenging the sufficiency of the evidence presents a mixed question of law and fact, this Court must defer to the state court's decision rejecting this claim unless petitioner shows that the decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1); Davila v. Davis, 650 F. App'x 860, 866 (5th Cir. 2016), aff'd, 137 S. Ct. 2058 (2017). For the following reasons, the Court finds that he has made no such showing.

---

[14] State v. Gaudet, No. 2016 KA 0631, 2016 WL 6427773, at *2-8 (La. App. 1st Cir. Oct. 31, 2016); State Rec., Vol. 6 of 7.
[15] State v. Gaddet [sic], 225 So. 3d 477 (La. 2017); State Rec., Vol. 6 of 8.

In this case, the state court correctly identified the controlling federal law concerning such claims: Jackson v. Virginia, 443 U.S. 307 (1979).[16]  Under Jackson, the question before a court is not "whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt. Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  Id. at 319 (citation and quotation marks omitted).  In other words, "[t]he Jackson inquiry 'does not focus on whether the trier of fact made the **correct** guilt or innocence determination, but rather whether it made a **rational** decision to convict or acquit.'" Santellan v. Cockrell, 271 F.3d 190, 193 (5th Cir. 2001) (emphasis added) (quoting Herrera v. Collins, 506 U.S. 390, 402 (1993)).

Because the Jackson standard is itself deferential, and because the AEDPA's standards of review are also deferential, a federal habeas court's review of a sufficiency of the evidence claim is in fact "twice-deferential." Parker v. Matthews, 567 U.S. 37, 43 (2012); see also Coleman, 566 U.S. at 651.  Accordingly, under the AEDPA, "a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court.  The federal court instead may do so only if the state court decision was objectively unreasonable." Cavazos v. Smith, 565 U.S. 1, 2 (2011) (quotation marks omitted).

---

[16] It must be noted that Louisiana's circumstantial evidence standard requiring that every reasonable hypothesis of innocence be excluded does **not** apply in federal habeas corpus proceedings; in these proceedings, **only** the Jackson standard need be satisfied, even if state law would impose a more demanding standard of proof.  Foy v. Donnelly, 959 F.2d 1307, 1314 n.9 (5th Cir. 1992); Higgins v. Cain, Civ. Action No. 09-2632, 2010 WL 890998, at *21 n.38 (E.D. La. Mar. 8, 2010), aff'd, 434 F. App'x 405 (5th Cir. 2011); Williams v. Cain, No. 07-4148, 2009 WL 224695, at *4 (E.D. La. Jan. 29, 2009), aff'd, 408 F. App'x 817 (5th Cir. 2011); see also Coleman v. Johnson, 566 U.S. 650, 655 (2012) ("Under Jackson, federal courts must look to state law for the substantive elements of the criminal offense, but the minimum amount of evidence that the Due Process Clause requires to prove the offense is purely a matter of federal law." (citation and internal quotation marks omitted)).

As a result, "[b]ecause rational people can sometimes disagree, the inevitable consequence of this settled law is that judges will sometimes encounter convictions that they believe to be mistaken, but that they must nonetheless uphold."  Id.

Mindful of these principles, the Court finds that petitioner's claim must be rejected for the following reasons.

As noted, petitioner was convicted of aggravated rape.  In pertinent part, Louisiana law at the time of the offense provided:  "Aggravated rape is a rape committed … where the … oral … sexual intercourse is deemed to be without lawful consent of the victim because it is committed … [w]hen the victim is under the age of thirteen years."  La. Rev. Stat. Ann. § 14:42(A)(4).[17]  Further, Louisiana law defined "rape" as follows:

> A. Rape is the act of anal, oral, or vaginal sexual intercourse with a male or female person committed without the person's lawful consent.
>
> B. Emission is not necessary, and any sexual penetration, when the rape involves vaginal or anal intercourse, however slight, is sufficient to complete the crime.
>
> C. For purposes of this Subpart, "oral sexual intercourse" means the intentional engaging in any of the following acts with another person:
>
> > (1) The touching of the anus or genitals of the victim by the offender using the mouth or tongue of the offender.
> >
> > (2) The touching of the anus or genitals of the offender by the victim using the mouth or tongue of the victim.

La. Rev. Stat. Ann. § 14:42.

---

[17] The statute has since been amended to change the name of this offense to "first degree rape."

At trial, G.T. testified that he was made to engage in oral sexual intercourse with petitioner.[18]  That testimony, in and of itself, was enough to support petitioner's conviction of the aggravated rape of G.T., because it has often been held that a victim's testimony alone is generally sufficient evidence to support a rape conviction.  See, e.g., Peters v. Whitley, 942 F.2d 937, 941-42 (5th Cir. 1991); see also Fetterley v. Whitley, No. 94-30310, 1994 WL 708655, at *1 n.6 (5th Cir. Dec. 6, 1994).

G.T. further testified at trial that he also witnessed petitioner engage in such acts with L.T. and T.T.[19]  And that testimony was adequate to support petitioner's convictions of the aggravated rapes of L.T. and T.T., because it is clear that "the testimony of a single, uncorroborated eyewitness is generally sufficient to support a conviction."  United States v. King, 703 F.2d 119, 125 (5th Cir. 1983) (quotation marks omitted)); accord Milon v. Vannoy, Civ. Action No. 19-13061, 2020 WL 6468229, at *8 (E.D. La. May 14, 2020), adopted, 2020 WL 6449156 (E.D. La. Nov. 3, 2020), certificate of appealability denied, No. 20-30722, 2021 WL 7502182 (5th Cir. Dec. 6, 2021), cert. denied, No. 21-7370, 2022 WL 1528461 (U.S. May 16, 2022); Davis v. Louisiana, Civ. Action No. 18-1878, 2018 WL 6981248, at *10 (E.D. La. Nov. 7, 2018), adopted, 2019 WL 130297 (E.D. La. Jan. 8, 2019); Ambo v. Cain, Civ. Action No. 05-3972, 2007 WL 2228538, at *2 (E.D. La. July 31, 2007).

Although petitioner challenges the credibility of G.T. and the state's other witnesses, it must be remembered that credibility determinations are the province of the jurors.  Therefore, a federal habeas court generally will not grant relief on a sufficiency claim grounded on such issues

---

[18] State Rec., Vol. 5 of 8, trial transcript, p. 523.

[19] Id. at pp. 523-24.

of credibility.   See Schlup v. Delo, 513 U.S. 298, 330 (1995) ("[U]nder Jackson, the assessment

of the credibility of witnesses is generally beyond the scope of review."); Ramirez v. Dretke, 398

F.3d 691, 695 (5th Cir. 2005) ("All credibility choices and conflicting inferences are to be resolved

in favor of the verdict."); McCowin v. Scott, No. 93-5340, 1994 WL 242581, at *2 (5th Cir. May

26, 1994); Phillips v. Cain, Civ. Action No. 11-2725, 2012 WL 2564926, at *14 (E.D. La. Apr.

11, 2012), adopted, 2012 WL 2565025 (E.D. La. July 2, 2012); Picou v. Cain, Civ. Action No. 06-

6258, 2007 WL 1521021, at *5 (E.D. La. May 22, 2007).

   To summarize:  when the evidence in the instant case is viewed in the light most favorable

to the prosecution, it simply cannot be said that the guilty verdicts were **irrational**.  Therefore,

petitioner cannot show that the state court's decision rejecting his claim was contrary to, or

involved an unreasonable application of, clearly established federal law, as determined by the

Supreme Court of the United States.  Accordingly, under the doubly deferential standards of

review which must be applied by this federal habeas court, petitioner's claim should be denied.

## B.  Jurors Erroneously Excused for Cause

   In his second claim, petitioner argues that his rights were violated when the trial judge

excused potential jurors Martin Lawson, Damien Verdin, Vernice Pertuit, Horace Davis, James

Price, and Teika Dominque for cause.  On direct appeal, the Louisiana First Circuit Court of

Appeal denied that claim, holding:

   In assignment of error number two, the defendant argues that as a former
   prosecutor, the trial judge "appeared to be predisposed to initiate and grant
   questionable challenges for cause."  The defendant specifically contests six State
   challenges for cause granted by the trial court.  Noting the life-changing effect of a
   guilty verdict, the defendant argues that the trial court abused its discretion in
   overruling defense objections in excusing the prospective jurors at issue.  The
   defendant argues that some of the prospective jurors were rehabilitated and gave

responses indicating they would take jury duty seriously. As the defendant further notes, the State used eleven peremptory challenges.

The purpose of voir dire examination is to determine prospective jurors' qualifications by testing their competency and impartiality and discovering bases for the intelligent exercise of cause and peremptory challenges. State v. Burton, 464 So.2d 421, 425 (La. App. 1st Cir.), writ denied, 468 So.2d 570 (La. 1985). Pursuant to La. C.Cr.P. art. 797(2), a prospective juror may be challenged for cause on the ground that the juror is not impartial, whatever the cause of his partiality. A defendant cannot complain of an erroneous grant of a challenge to the State unless the effect of such a ruling is the exercise by the State of more peremptory challenges than it is entitled to by law. La. C.Cr.P. art. 800(B). A challenge for cause should be granted, even when a prospective juror declares his ability to remain impartial, if the juror's responses as a whole reveal facts from which bias, prejudice, or inability to render judgment according to law may be reasonably implied. A trial court is vested with broad discretion in ruling on challenges for cause and these rulings will be reversed only when a review of the voir dire record as a whole reveals an abuse of discretion. State v. Martin, 558 So.2d 654, 658 (La. App. 1st Cir.), writ denied, 564 So.2d 318 (La. 1990).

First, the defendant notes that the trial court did not allow any rehabilitation before releasing Martin Lawson because he knew the defendant and heard about the case. Lawson confirmed that he was the defendant's neighbor, that they sometimes talked in the neighborhood, and that he knew some of the defendant's family members. When asked if the fact that he was the defendant's neighbor would affect his ability to be fair and impartial, he stated, "I would say so, yes, sir." In excusing Lawson, the trial court noted that he learned about the case from "neighborhood talk" and that he knew the family. In objecting, the defense attorney argued that Lawson could be fair and impartial. In overruling the defendant's objection, the trial court reiterated that Lawson knew facts about the case.

Second, juror Damien Verdin had a criminal background, was related to a police officer, and had transportation issues. The defendant notes that transportation could have been arranged, and that Verdin stated that he would be fair and impartial. Verdin also stated, however, that he was arrested for a fight as a teenager and later stated that he felt that he did not get a fair chance from the district attorney's office. The trial court interrupted Verdin as he further explained his issue in that situation. The trial court noted that it was inclined to just release Verdin since he also had transportation problems. In objecting, the defense counsel stated, "I just object to it." When asked for grounds for the objection, the defense counsel stated in part, "he's obviously saying everything he can say to get you to release him. I think he wants out, but I don't think that means he can't be fair and impartial."

Third, the defendant notes that his cousin, Vernice Pertuit, was released although she thought she could be fair and impartial, was not closely related to the defendant, and had never met the defendant before the trial. The defendant also argues that Pertuit was subjected to improper questioning when the trial court asked

her how she would feel if the victim was her child. When asked if she knew what the case was about, Pertuit stated that the defendant's mother is her first cousin. She stated that she did not know the facts of the case, but when asked if she could be fair and impartial, she stated[,] "I really can't say. I really don't know." When asked if she would hold the State to a higher standard, she stated, "Not really, no. If it has to be fair, what I know is fair and square." When questioned about the possibility of her family members testifying and whether that would affect her, she stated, "I don't know how to answer this." The State explained the duty to be fair and impartial and asked if she was able to do so and she stated, "I guess."

Horace Davis, the fourth prospective juror at issue, knew the defendant from childhood and was related to a trial witness, but stated these factors would not affect his judgment. Davis also stated that he knew about the case, although he did not realize before the trial that it involved the defendant, adding that he lived close to the same neighborhood. Davis stated that he did not know the defendant well enough to make any judgment against him. When asked if he could be fair and impartial, he stated, "Should be, I guess, to be honest about it." Davis also stated that his first cousin Willie Harris was dating the defendant's sister at the time of the trial. As noted by the defendant, James Price, the fifth prospective juror at issue, was released even though he stated that he could be fair despite knowing the defendant for three years. The defendant also notes that while Price had misgivings about judging people, he stated that he could find the defendant guilty. Price specifically stated that the defendant lived right behind him, that he knew the defendant's sister Karen Harris, but that he did not know the victims. He further stated that Harris was his nurse. Price stated that he could be fair and impartial but added, "But like I say, I'm not the one that judge. The Bible say not to judge no one, you know." He further stated that it would be hard for him to find the defendant guilty since he did not like to see people go to jail.

Finally, as noted by the defendant, while Teika Dominique professed the innocence of her brother-in-law who was accused of child abuse in Lafourche Parish, she stated that her opinion of this case depended on the evidence. When asked if that would affect her in this case, Dominique responded positively. She confirmed that she would not be fair to the State because she would feel that the State could be prosecuting an innocent person and would not fairly consider a child's testimony. When rehabilitation was attempted, she still stated that she was not sure if she could be fair and impartial.

Reviewing the transcript of voir dire as a whole, we find that the trial court did not err or abuse its discretion in granting the State's six challenges for cause at issue. Despite the defendant's attempt to minimize the prospective jurors' statements, we find that the responses revealed facts from which bias, prejudice, or inability to render judgment according to law could reasonably be inferred.

Accordingly, the trial court properly excused the jurors at issue.  <u>See</u> La. C.Cr.P. art. 797(2).  This assignment of error is without merit.[20]

The Louisiana Supreme Court then likewise denied relief without assigning additional reasons.[21]

To the extent that petitioner is attempting to argue that the state courts misapplied the state law on this issue, that claim simply is not cognizable in this federal court.  "[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions." <u>Trevino v. Johnson</u>, 168 F.3d 173, 184 (5th Cir. 1999) (quotation marks omitted); <u>accord</u> <u>Dickerson v. Guste</u>, 932 F.2d 1142, 1145 (5th Cir. 1991) ("We will not review a state court's interpretation of its own law in a federal habeas corpus proceeding.  We do not sit as a 'super' state supreme court in such a proceeding to review errors under state law." (internal citation and quotation marks omitted)).  Federal habeas corpus relief may be granted only to remedy violations of the Constitution and laws of the United States; mere violations of state law will not suffice.  28 U.S.C. § 2254; <u>Engle v. Isaac</u>, 456 U.S. 107, 119 (1983).

Moreover, to the extent that petitioner is arguing that his rights under **federal** law were violated by the removal of these jurors, his claim clearly fails.  Without more, the erroneous exclusion of impartial jurors generally does not violate a defendant's federal constitutional rights, even if the effect of the error is tantamount to granting the prosecution extra peremptory challenges.  Rather, the focus is not on the jurors excused but instead on the jury ultimately empaneled.  So long as the jury that actually sat in the case was impartial, a trial court's exclusion of a potential juror – even if erroneous[22] – simply does not constitute reversible constitutional

---

[20] <u>State v. Gaudet</u>, No. 2016 KA 0631, 2016 WL 6427773, at *8-9 (La. App. 1st Cir. Oct. 31, 2016); State Rec., Vol. 6 of 7.

[21] <u>State v. Gaddet</u> [sic], 225 So. 3d 477 (La. 2017); State Rec., Vol. 6 of 8.

[22] This comment should not be read to suggest that the trial judge's rulings regarding the prosecutor's challenges for cause were erroneous in the instant case.  As noted, on direct appeal, the Louisiana First Circuit Court of Appeal

error.  Jones v. Dretke, 375 F.3d 352, 355-57 (5th Cir. 2004).[23]  Here, petitioner has not argued,

much less shown, that the jury that ultimately sat in his case was not impartial.  Accordingly, he

has failed to prove a federal constitutional violation with respect to this claim.  See, e.g., Donaldson

v. Vannoy, Civ. Action No. 14-1896, 2017 WL 2954628, at *6 (E.D. La. Apr. 12, 2017), adopted,

2017 WL 2936216 (E.D. La. July 10, 2017).

## C.  Denial of a Defense Challenge for Cause

In his third claim, petitioner argues that his rights were violated when the trial judge denied

the defense's challenge for cause of Onda Templeton.  On direct appeal, the Louisiana First Circuit

Court of Appeal denied that claim, holding:

> [T]he defendant argues that the trial court committed reversible error in denying
> the defense's challenge for cause of Onda Templeton, noting that a defense
> peremptory challenge was used to excuse the prospective juror.  The defendant
> notes that Templeton was challenged because the prosecutor in this case had
> represented him in a child custody case several years before the trial.  The defendant
> notes that Templeton further revealed that his father had just finished the police
> academy and was an employee of the Lafourche Parish Sheriff's Office.  As further
> noted, Templeton had served on a jury in a civil case.  Conceding that Templeton
> claimed he could be impartial, the defendant argues that Templeton was not capable
> of doing so.  The defendant also argues that Templeton was not qualified to serve
> as a juror due to his relationship with the prosecutor and his father's employment
> as a deputy sheriff.  The defendant argues that Templeton would have naturally
> been predisposed to side with the State before hearing any evidence.  The defendant
> further contends that it is "highly doubtful" that Templeton could have put aside
> these feelings in spite of being directed to do so by the trial court.
>
> An accused in a criminal case is constitutionally entitled to a full and
> complete voir dire examination and to the exercise of peremptory challenges.  La.
> Const. art. I, § 17(A).  Prejudice is presumed when a challenge for cause is denied
> erroneously by a trial court and the defendant has exhausted his peremptory

expressly found that "the trial court did not err or abuse its discretion in granting the State's six challenges for cause
at issue."  State v. Gaudet, No. 2016 KA 0631, 2016 WL 6427773, at *9 (La. App. 1st Cir. Oct. 31, 2016); State Rec.,
Vol. 6 of 7.  That finding was clearly correct.

[23] A limited exception to this general rule exists in capital cases where the potential juror was excused for cause based
on his opposition to the death penalty even though his views would not have prevented or substantially impaired his
ability to perform as a juror.  Gray v. Mississippi, 481 U.S. 648 (1987).  However, this Circuit does not apply that
exception outside of capital cases involving such challenges.  Jones, 375 F.3d at 356.  This is not such a case.

challenges. State v. Robertson, 92-2660 (La. 1/14/94), 630 So.2d 1278, 1280; State v. Ross, 623 So.2d 643, 644 (La. 1993). An erroneous ruling depriving an accused of a peremptory challenge violates his substantial rights and constitutes reversible error. Ross, 623 So.2d at 644. Nonetheless, a defendant is permitted to complain of a ruling refusing to sustain his challenge for cause even if he had not thereafter exercised all of his peremptory challenges. State v. Vanderpool, 493 So.2d 574, 575 (La. 1986). See also State v. Copeland, 530 So.2d 526, 535 (La. 1988), cert. denied, 489 U.S. 1091, 109 S.Ct. 1558, 103 L.Ed.2d 860 (1989). In such a case, the defendant must be able to show some prejudice in order to overcome the requirement of La. C.Cr.P. art. 921 that "[a] judgment or ruling shall not be reversed by an appellate court because of any error ... which does not affect substantial rights of the accused." Robertson, 630 So.2d at 1280. A trial court is accorded great discretion in determining whether to seat or reject a juror for cause, and such rulings will not be disturbed unless a review of the voir dire as a whole indicates an abuse of that discretion. Martin, 558 So.2d at 658.

At the outset we note that the defendant had twelve peremptory challenges and according to our review of the record, only ten were used in picking the twelve jurors (one additional defense peremptory challenge was used during the selection of the alternate juror).[FN 6]  Thus, prejudice is not presumed in this case. See La. C.Cr.P. art. 799. Moreover, the defendant has not alleged or shown how he was prejudiced. Further, as the defendant concedes, Templeton stated that he could be fair and impartial and none of his responses conflicted with this claim. Considering Templeton's answers and the deference that must be given to the trial court's ruling, we find no abuse of discretion in the trial court's denial of the defendant's challenge for cause at issue. Accordingly, this assignment lacks merit.

> [FN 6]  As the State notes in part in its appeal brief, the record is inconsistent as to the number of peremptory challenges used by the defendant. Specifically, the minutes allocated two peremptory challenges to the defense regarding the excusal of prospective jurors Cathy Hebert and Ellen Howes. However, according to the transcript, Cathy Hebert was actually excused for cause on the motion of the defense, and Ellen Howes was excused upon the State's peremptory challenge. Further, the trial court informed the defense counsel that the defendant had used nine peremptory challenges at the point where only eight defense peremptory challenges had been used. Thus, by the time the defendant used his ninth peremptory challenge, the parties were under the impression that he had used ten. The defendant was aware of the availability of and declined to use a back strike after twelve jurors were accepted. Likewise, the defense counsel was repeatedly made aware of the fact that the twelve peremptory challenges had not been exhausted. We note that when there is a discrepancy between the minutes and transcript, the transcript prevails. State v. Lynch, 441 So.2d 732, 734 (La. 1983).[24]

---

[24] State v. Gaudet, No. 2016 KA 0631, 2016 WL 6427773, at *9-10 (La. App. 1st Cir. Oct. 31, 2016); State Rec., Vol. 6 of 7.

The Louisiana Supreme Court then likewise denied relief without assigning additional reasons.[25]

This claim warrants little consideration in this federal habeas corpus proceeding. Regardless of whether Templeton should have been excused for cause, which is an issue this Court need not and does not reach, petitioner's claim clearly fails for an entirely different reason:  after the challenge for cause was denied, **defense counsel used a peremptory challenge to remove Templeton from the jury**.[26]  Where, as here, the potential juror was removed through use of a peremptory challenge after the denial of a challenge for cause, the petitioner is entitled to federal habeas corpus relief only if he demonstrates that the jury **ultimately selected** to try his case was not impartial.  Ross v. Oklahoma, 487 U.S. 81, 85-86 (1988).  In Ross, the Supreme Court further expressly noted:

> [W]e reject the notion that the loss of a peremptory challenge constitutes a violation of the constitutional right to an impartial jury.  We have long recognized that peremptory challenges are not of constitutional dimension.  They are a means to achieve the end of an impartial jury.  So long as the jury that sits is impartial, the fact that the defendant had to use a peremptory challenge to achieve that result does not mean the Sixth Amendment was violated.

Id. at 88 (citations omitted); accord Edwards v. Stephens, 612 F. App'x 719, 722 (5th Cir. 2015) ("[T]he forced use of a peremptory challenge does not rise to the level of a constitutional violation. Instead, a district court's erroneous refusal to grant a defendant's challenge for cause is only grounds for reversal if the defendant establishes that the jury which actually sat to decide his guilt or innocence was not impartial." (citation and quotation marks omitted)).

Because defense counsel used a peremptory challenge to remove Templeton, and because petitioner made no effort to establish that the jury ultimately selected was not impartial, his claim

---

[25] State v. Gaddet [sic], 225 So. 3d 477 (La. 2017); State Rec., Vol. 6 of 8.
[26] State Rec., Vol. 3 of 8, trial transcript, pp. 120-21; State Rec., Vol. 1 of 8, minute entry dated November 3, 2015.

necessarily fails. <u>Dorsey v. Quarterman</u>, 494 F.3d 527, 533 (5th Cir. 2007); <u>Lagrone v. Cockrell</u>, No. 02-10976, 2003 WL 22327519, at *12 (5th Cir. Sept. 2, 2003); <u>Arita v. Cain</u>, Civ. Action No. 11-636, 2011 WL 4738666, at *29 (E.D. La. Aug. 25, 2011), <u>adopted</u>, 2011 WL 4738658 (E.D. La. Oct. 6, 2011), <u>aff'd</u>, 500 F. App'x 352 (5th Cir. 2012); <u>Higgins v. Cain</u>, Civ. Action No. 09-2632, 2010 WL 890998, at *27 (E.D. La. Mar. 8, 2010), <u>aff'd</u>, 434 F. App'x 405 (5th Cir. 2011); <u>Wilson v. Cain</u>, Civ. Action No. 06-890, 2009 WL 2163124, at *12 (E.D. La. July 16, 2009), <u>aff'd</u>, 641 F.3d 96 (5th Cir. 2011).

### D.  Ineffective Assistance of Counsel

In his fourth and final claim, petitioner argues that his "trial counsel was ineffective for failure to file a motion to hire an expert to do a swab examination on L.T., T.T., and G.T. for the defense that violated his client's rights under the 6th and 14th Amendments to the United States Constitution."[27]  The clearly established federal law governing such ineffective assistance of counsel claims is <u>Strickland v. Washington</u>, 466 U.S. 668 (1984).

In <u>Strickland</u>, the United States Supreme Court held:

> A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction … has two components.  First, the defendant must show that counsel's performance was deficient.  This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment.  Second, the defendant must show that the deficient performance prejudiced the defense.  This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.  Unless a defendant makes both showings, it cannot be said that the conviction … resulted from a breakdown in the adversary process that renders the result unreliable.

<u>Id.</u> at 697.

---

[27] Rec. Doc. 1-1, p. 21.

When assessing whether counsel's performance was deficient, a federal court must always be mindful that "<u>Strickland</u> does not guarantee perfect representation, only a reasonably competent attorney." <u>Harrington v. Richter</u>, 562 U.S. 86, 110 (2011). Therefore, "[t]o establish deficient performance, a person challenging a conviction must show that counsel's representation fell below an objective standard of reasonableness." <u>Id.</u> at 104 (quotation marks omitted). Moreover, the Supreme Court has cautioned:

> Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy. There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way.

<u>Strickland</u>, 466 U.S. at 689 (citations and quotation marks omitted).

> <u>Strickland</u>'s prejudice component is no less exacting. The Supreme Court has explained:

> In assessing prejudice under <u>Strickland</u>, the question is not whether a court can be certain counsel's performance had no effect on the outcome or whether it is possible a reasonable doubt might have been established if counsel acted differently. Instead, <u>Strickland</u> asks whether it is reasonably likely the result would have been different. This does not require a showing that counsel's actions more likely than not altered the outcome, but the difference between <u>Strickland</u>'s prejudice standard and a more-probable-than-not standard is slight and matters only in the rarest case. The likelihood of a different result must be substantial, not just conceivable.

<u>Richter</u>, 562 U.S. at 111-12 (citations and quotation marks omitted).

In the instant case, petitioner asserted his ineffective assistance of counsel claim to the state courts on collateral review. The state courts denied the claim on the merits as follows.

The state district court denied relief, stating:

> In assessing a claim of ineffectiveness, a two-pronged test is employed. The defendant must show that (1) his attorney's performance was deficient, and (2) the deficiency prejudiced him. Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); State v. Soler, 93-1042, p. 9 (La. App. 5th Cir. 4/26/94), 636 So.2d 1069, 1075, writs denied, 94-0475 (La. 4/4/94), 637 So.2d 450; 94-1361 (La. 11/4/94), 644 So.2d 1055. To show "prejudice" as required in order to establish ineffective assistance of counsel, the defendant must demonstrate that, but for counsel's unprofessional conduct, the outcome of the trial would have been different. Strickland v. Washington, 466 U.S. at 687, 104 S.Ct. at 2064; State v. Soler, supra.
>
> Effective assistance of counsel does not mean errorless counsel, or counsel who may be judged ineffective on mere hindsight. State ex rel. Graffagnino v. King, 436 So.2d 559, 564 (La. 1983). It is not enough for an accused to make allegations of ineffectiveness; the accused must couple these allegations with a specific showing of prejudice. State v. Brogan, 453 So.2d 325 (La. App. 3 Cir. 1984), writ denied, 457 So.2d 1200 (La. 1984). State v. Morris, 98-236 (La. App. 5 Cir. 9/16/98) 719 So.2d 1076.
>
> As explained in the State's brief, identity was never an issue. "DNA analysis cannot help the trier of fact determine whether either force or consent was present[.] DNA testing in this matter was irrelevant[.] Any negative findings would not have exonerated the defendant from the specific claims presented at trial.
>
> The Court finds that Petitioner's counsel was not ineffective insofar as he failed to pursue testing in regard to a theory which was not applicable to the law and facts. Petitioner failed to show that, but for his attorney's "alleged" unprofessional conduct, the outcome would have been different. As such, Petitioner's application is dismissed without a hearing.[28]

The Louisiana First Circuit Court of Appeal likewise denied the claim, holding:

> **WRIT DENIED.** The filing and pursuit of pretrial motions is squarely within the ambit of the attorney's trial strategy, and counsel is not required to engage in efforts of futility. State v. Shed, 36,321 (La. App. 2d Cir. 9/18/02), 828 So.2d 124, 132, writ denied, 2002-3123 (La. 12/19/03), 861 So.2d 561. Furthermore, the testimony of the victim alone is sufficient to prove the elements of the offense. See State v. Rives, 407 So.2d 1195, 1197 (La. 1981). In light of the victims' testimony in this case, relator failed to meet his burden of showing trial counsel's decision not to

---

[28] State Rec., Vol. 7 of 8, Reasons for Judgment dated September 16, 2020, p. 2.

request a DNA swab examination was deficient conduct.  Therefore, the district court did not abuse its discretion by dismissing relator's application for postconviction relief without an evidentiary hearing.[29]

The Louisiana Supreme Court thereafter denied petitioner's related writ application, succinctly holding:  "Denied.  Applicant fails to show that he received ineffective assistance of counsel under the standard of Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)."[30]

Where, as here, a habeas petitioner's ineffective assistance of counsel claim was denied on the merits in the state courts, he faces even greater obstacles to obtaining relief on the claim in federal court.  Specifically, because such a claim presents a mixed question of law and fact, the petitioner is entitled to federal habeas relief only if he shows that the state court decision denying the claim was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."  28 U.S.C. § 2254(d)(1); Moore v. Cockrell, 313 F.3d 880, 881 (5th Cir. 2002).

In the instant case, that showing has not been made.  On the contrary, the state court decision correctly identified Strickland as the controlling federal law and applied it in an eminently reasonable manner.  It is beyond cavil that that "[c]ounsel is not required by the Sixth Amendment to file meritless motions."  And, here, the proposed motion for DNA testing would have been not merely meritless, but patently frivolous.  Petitioner's suggestion that the defense would have benefitted from such testing of the victims is ludicrous.  By the time the rapes were reported, too much time had already elapsed for any meaningful DNA oral "swab examination[s]" to be

---

[29] State v. Gaudet, No. 2020 KW 1020, 2021 WL 141229 (La. App. 1st Cir. Jan. 14, 2021); State Rec., Vol. 7 of 8.
[30] State v. Gaudet, 315 So. 3d 856 (La. 2021); State Rec., Vol. 7 of 8.

performed.  Because there was therefore no reasonable probability that the proposed DNA testing would have yielded exculpatory results, counsel's failure to seek such testing did not constitute deficient performance and resulted in no prejudice.

For these reasons, petitioner has not demonstrated that the state court decision rejecting his ineffective assistance of counsel claim was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States. Accordingly, utilizing the AEDPA's doubly deferential standards of review applicable to such claims, this Court should likewise deny relief.

<u>**RECOMMENDATION**</u>

It is therefore **RECOMMENDED** that the federal application for habeas corpus relief filed by Christopher Gaudet be **DISMISSED WITH PREJUDICE**.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object.  28 U.S.C. § 636(b)(1); <u>Douglass v. United Services Auto. Ass'n</u>, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc).

New Orleans, Louisiana, this _____24th_____ day of June, 2022.

**JANIS VAN MEERVELD**
**UNITED STATES MAGISTRATE JUDGE**

29